IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRICIA HAMBLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | NO. 3:21-cv-00816 |
| WILSON COUNTY, TENNESSEE and | ) | |
| LISA COLTOGIRONE, | ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE HOLMES |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM

Pending before the Court are Defendants' motions for summary judgment (Doc. Nos. 80, 83), which are fully briefed. (Doc. Nos. 90, 97, 99). For the reasons stated herein, the motion filed by Wilson County, Tennessee will be **DENIED** and the motion filed by Lisa Coltogirone will be **GRANTED** as to Count VII and will be **DENIED** as to the remaining claims.

## I.  BACKGROUND[1]

This is a civil rights action arising from Plaintiff Patricia Hamblin's ("Hamblin") employment as a judicial commissioner of Wilson County, Tennessee.[2] Judicial commissioners

---

[1]    At this stage, the Court construes the factual record in the light most favorable to Plaintiff, the nonmoving party. *C.S. v. McCrumb*, 135 F.4th 1056, 1060 (6th Cir. 2025). The factual background in this Memorandum is not a complete statement of the facts in this case but rather includes the facts necessary for the Court's analysis and resolution of the pending motions.

[2]    For ease of reference, the statements of material facts and responses are cited as follows:

- Wilson County's Statement of Undisputed Material Facts (Doc. No. 81) together with Hamblin's Response (Doc. No. 92) is cited as "Wilson County SOF ¶ __."

- Hamblin's Statement of Material Facts in Dispute (Doc. No. 94) together with Wilson County and Lisa Coltogirone's Responses (Doc. Nos. 100, 98) is cited as "Pl. SOF ¶__."

for Wilson County, Tennessee are appointed for a set term according to state law by a county commission and may not be removed from their position mid-term except through formal ouster proceedings, governed by Tennessee Code Annotated §§ 8-47-101 *et seq*. *See* Tenn. Op. Atty. Gen. No. 00-126 (Aug. 7, 2000). Hamblin's official job duties as a judicial commissioner included making probable cause determinations in response to warrant applications; issuing arrest and search warrants, juvenile petitions, and criminal summonses; and setting bond. *See* Tenn. Code Ann. § 40-1-111. Additionally, the Judicial Commissioner Job Description sets forth other "essential functions" of the job, including communicating with other departments, law enforcement personnel, judges, court personnel, attorneys, warrant/booking officers, youth services officers, the public, and other individuals as needed to coordinate work activities, review status of work, exchange information, or resolve problems. (*See* Doc. No. 90-2).

In 2020, the Tennessee Comptroller's Office investigated Wilson County's Judicial Commission and found that the Chief Judicial Commissioner, Randy Hawkins, had committed fraud by falsely reporting hundreds of hours he did not actually work. (Pl. SOF ¶ 4). Hawkins ultimately resigned on August 25, 2020. (*Id*.).

In February 2021, Wilson County created a new position known as "Director of Judicial Commissioners" and appointed Defendant Lisa Coltogirone to the fill that role. When Coltogirone was appointed, Hamblin was in the third year of her third consecutive four-year term as a judicial commissioner.[3]

---

- The Court does not rely on Lisa Coltogirone's Statement of Undisputed Material Facts (Doc. No. 84) because the facts contained therein are immaterial to the Court's analysis of whether she is entitled to qualified immunity.

[3]     The Wilson County Commission first appointed Hamblin for a four-year term as a judicial commissioner in 2010 and subsequently reappointed her for two more consecutive four-year terms.

On March 19, 2021, Coltogirone held a meeting with the judicial commissioners during which she recounted how someone had contacted the Tennessee Comptroller's office about her "predecessor," Randy Hawkins, suggesting that he was committing fraud. (Pl. SOF ¶ 4; Wilson County SOF ¶ 7). Coltogirone told everyone present at the meeting that no one was going to call the Comptroller's office or the Administrative Office of the Courts on her and adamantly instructed that no one was to call the District Attorney's office, any County Commissioner, or anyone on the Judicial Committee about anything related to the judicial commissioner's office. (Pl. SOF ¶ 4).

On April 11, 2021, Coltogirone sent the following to all the judicial commissioners:

> Additionally, it has been brought to my attention that some Commissioners appear to be picking and choosing which policies and directives to follow. Please be clear, my directives are not discretionary or optional. If you choose to disregard policies and rules a written reprimand will be issued from this point forward. ….
> [Y]ou are required to follow ALL directives, policies, and procedures at ALL times.

(Doc. No. 90-7).

At the end of May 2021, a judicial commissioner, Christopher Miller, made a sexual harassment complaint against Coltogirone. (*See* Coltogirone's Answer, Doc. No. 21 ¶ 39 in Case No. 3:22-cv-00118). Wilson County hired Angelita Fisher to investigate the sexual harassment complaint. On or about July 6, 2021, Coltogirone informed the judicial commissioners that Fisher would be interviewing all of them as part of the sexual harassment investigation. Fisher interviewed Hamblin as part of that investigation on July 13, 2021.

The Judicial Commissioners Association of Tennessee ("JCAT") scheduled a three-day training conference in Murfreesboro, Tennessee at the end of July 2021.[4] In an email dated July 8,

---

[4] State law requires judicial commissioners to complete a certain number of continuing education hours each calendar year, and that at least ten of the required hours be completed by attending conferences or courses sponsored or approved by JCAT. *See* Tenn. Code Ann. § 40-1-111(f).

2021, Coltogirone directed that all judicial commissioners would be commuting to the conference for each of the 3 days of instruction. (Doc. No. 80-4). In the same email, Coltogirone stated that, "[i]n keeping with the County policy, hotel rooms and per diem expenses are not provided for events within 50 miles. You will be reimbursed for your mileage from your house to the conference site and back for each day of travel." Hamblin responded minutes later that "JCAT pays for the rooms." Coltogirone responded, at 1:36 p.m., that "[t]he matter was discussed with the Mayor today and you all will travel back forth [sic] daily." At 1:38 p.m., Hamblin wrote "I quit." At 1:40 p.m., Coltogirone replied, "Please email me your formal resignation." At 1:41 p.m., Hamblin wrote back, "[w]orking on it now."

At 2:30 p.m., Hamblin called the mayor about Coltogirone directing all the judicial commissioners to drive back and forth at the expense of Wilson County taxpayers. Hamblin recorded this conversation. The mayor denied directing all the judicial commissioners to drive back and forth to Murfreesboro for the JCAT conference instead of staying overnight at JCAT's expense. In the same recorded conversation with Hamblin, the mayor stated:

> I don't care whether you drive or whether you stay. That's none of my business. I don't govern your office from here. Simply because its supposed to be set autonomous to where the judges, or me, or the sheriff don't control you all. That's why you don't have any oversight, really, there from any of us. So, I don't really have anything to do with your office or tell you you can, or can't, or all that stuff. I'm really kind of detached from your office by way of the law, [County Attorney] Mike Jennings says.

(Hamblin Decl., Doc. No. 90-4 ¶ 8).

After her call with the mayor, Hamblin called the Chair of the Judicial Committee, also an elected official. (*Id*. ¶ 9). She also recorded this conversation. Hamblin told the Chair that Coltogirone was mandating that judicial commissioners drive back and forth to the JCAT conference at Wilson County expense even though JCAT was offering to pay for all expenses for

4

them to stay overnight in Murfreesboro (the "JCAT speech"). (*Id*.). Hamblin explained, "[s]o, now, Wilson County is going to be out money it wouldn't have to be out because of her decision." (*Id*.). The Judicial Committee Chair said he would "look into it" and that he would talk with some other committee members. (*Id*.).

At 3:15 p.m., Hamblin emailed Coltogirone "I will be working my assigned schedule. I just don't understand why Wilson County has to pay for mileage when fiscally it would be paid for by JCAT." (Doc. No. 90-8). Coltogirone wrote in response, "What is the effective date of your resignation? I didn't get your email. Fiscal matters of our Office are my responsibility." (*Id*.). Hamblin responded, "I recall end [sic] the 'I quit' statement." (*Id*.). Coltogirone wrote back, "I accepted your resignation its not up for recall that's not how things work. Will you be working out a two notice from today?" (*Id*.). Hamblin responded, "March 2022," which was the date her then-current four-year term was set to expire. (*Id*.).

On July 10, 2021, Hamblin spoke with Terry Ashe, an elected official and member of the Judicial Committee. (Doc. No. 90-4 ¶ 10). Hamblin explained that she did not want to quit and that Coltogirone was trying to push her out, but Ashe told Hamblin that he could not help her. (*Id*.). Hamblin then texted two other members of the Judicial Committee, neither of whom responded.

On July 12, 2021, Hamblin spoke with Qiana Scruggs at Wilson County Human Resources and explained that she had not quit her job and never meant the "I quit" statement to mean she quit her job. That evening, at 5:48 p.m., Hamblin received an email from Coltogirone stating:

> Good Afternoon,
>
> On July 8, 2021 I received the email you sent from your work email address to my work email address that stated "I quit." I officially accepted your resignation the same date, July 8, 2021 with a separation date of July 21, 2021, which includes a two week notice from your resignation date. I understood from a subsequent email that you intend to work your remaining scheduled shifts.

5

Your benefits will go through July 31, 2021. You may also contact the insurance Division regarding any retirement options that may be available to you.

Please return all equipment and property, including but not limited to key fob, ID badge, judicial tags, that belongs to Wilson County Government by July 21, 2021 in order to receive your last paycheck accurately and timely.

(Doc. No. 90-9).

Coltogirone made the judicial commissioner schedule. (Doc. No. 90-12). The last judicial commissioner schedule Hamblin appeared on had her scheduled through July 17, 2021. (Doc. No. 90-10). When the schedule for July 18 through August 14 was published, Hamblin was not on the schedule. (Doc. No. 90-11).

On September 3, 2021, Hamblin filed a Charge of Discrimination with the U.S. Equal Opportunity Commission regarding Coltogirone's actions. (Doc. No. 91-1). On October 27, 2021, Hamblin filed the initial complaint in the present action against Coltogirone and Wilson County, alleging misconduct in violation of her constitutional and civil rights. (*See* Doc. No. 1). On November 9, 2021, the Judicial Committee met and went into an executive session to discuss the Hamblin "Federal Lawsuit." (Doc. No. 90-1 at 12).

Meanwhile, Wilson County had vacancies for judicial commissioners in September 2021 and February 2022, which Hamblin applied for. (*See* Doc. Nos. 91-8, 91-4). Judicial commissioners for Wilson County are officially appointed by the Wilson County Commission on recommendations from the Judicial Committee. However, the Judicial Committee does not see all the job applications submitted for judicial commissioner openings. Rather, Coltogirone solicits and receives the applications for the judicial commissioner openings, decides who to interview, and then decides who to recommend to the Judicial Committee and the Wilson County Commission. (*See* Doc. No. 90-1 at 12-64). Once Coltogirone recommends a candidate for

6

appointment, the Judicial Committee and County Commission always follow her recommendation without discussion, effectively "rubber stamping" her recommendations. (*See id.*). Here, Coltogirone received and reviewed Hamblin's applications for the open judicial commissioner positions but did not select her for an interview or recommend her to the Judicial Committee. Accordingly, the Judicial Committee and County Commission did not consider Hamblin as an applicant, and she was not appointed to any of the subsequent judicial commissioner openings.

On March 8, 2022, Hamblin filed an Amended Complaint. (*See* Doc. No. 26). In her Amended Complaint, Hamblin brings two claims against Coltogirone under Section 1983 for allegedly violating her rights secured by the First Amendment (Count V and Count VI) and a single state law slander claim (Count VII). In her Amended Complaint Hamblin claims Wilson County is liable under Section 1983 for Coltogirone's violations of Hamblin's constitutional rights (Counts I, II, III). Hamblin also brings retaliation claims against Wilson County under Title VII of the Civil Rights Act of 1964 (Count VII), the Tennessee Human Rights Act (Count IX), and the Tennessee Public Employee Political Freedom Act of 1980 (Count IV).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

7

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

### III.     ANALYSIS

As an initial matter, Coltogirone's motion for summary judgment will be granted on Hamblin's slander claim as unopposed. (Doc. No. 90 at 40 (stating slander claim is withdrawn)).

Additionally, there is a genuine dispute of material fact as to whether Hamblin resigned from her position as judicial commissioner. Because this material fact is disputed and because Hamblin is the nonmoving party, the Court credits Hamblin's account that she did not resign for purposes of resolving the pending motions for summary judgment. Accordingly, Defendants' arguments for summary judgment premised on Hamblin's "resignation" fail to show the absence the absence of material disputes of fact.

The Court will take up Defendants' respective motions for summary judgment in turn.

### A.  Coltogirone

Hamblin brings this lawsuit against Coltogirone for allegedly violating her First Amendment rights. As a general matter, the First Amendment prohibits government officials from

8

subjecting individuals to "retaliatory actions" after the fact for having engaged in protected speech. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Another implication of the First Amendment's protection of free speech "is that the government usually may not impose prior restraints on speech." *Id*. (citing *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 718–720 (1931)); *see e.g.*, *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 877 (6th Cir. 2024) ("Courts recognize both 'prior restraint' claims and 'retaliation' claims under the Free Speech Clause."). Here, Hamblin claims Coltogirone violated her First Amendment rights on two different occasions. First, when Coltogirone told the judicial commissioners that they were not allowed to contact public officials about fraud or anything else in their office. And second, when Coltogirone retaliated against Hamblin because of her JCAT speech by removing her from the work schedule, notifying HR to process her "resignation," and submersing her subsequent applications for open judicial commissioner vacancies.

Coltogirone moves for summary judgment on qualified immunity grounds. "Qualified immunity shields government officials sued in their personal capacity from liability for civil damages unless: (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Novak v. Federspiel*, 140 F.4th 815, 820 (6th Cir. 2025) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)) (internal quotation marks omitted)).

For the reasons explained below, Hamblin has shown she has evidence from which a reasonable jury could conclude that Coltogirone violated her First Amendment rights. And the unlawfulness of Coltogirones' conduct was clearly established at the time. Accordingly, summary judgment is inappropriate on the issue of qualified immunity.

9

1. <u>First Amendment Retaliation</u> (Count V)

"In a First Amendment retaliation claim, retaliation for the exercise of constitutional rights is itself a violation of the Constitution." *Hill v. Lappin*, 630 F.3d 468, 473 (6th Cir. 2010) (citation and internal quotations omitted). "And this right extends to public employees." *Barton v. Neeley*, 114 F.4th 581, 591–92 (6th Cir. 2024) (citing *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) ("The First Amendment's guarantee of freedom of speech protects government employees from termination because of their speech on matters of public concern.")). To demonstrate a First Amendment retaliation claim against a government official, a plaintiff must show that First Amendment protected her speech, that the official took adverse action against her, and that there was causal connection between her protected speech and the adverse conduct. *See Hall v. Navarre*, 118 F.4th 749, 759 (6th Cir. 2024). Here, Hamblin claims Coltogirone retaliated against her for her JCAT speech by removing her from the work schedule, notifying HR to process her "resignation," and submersing her subsequent applications for judicial commissioner vacancies.

a. <u>Protected Speech – Element One</u>

"Generally, the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); (2) the speech was not made pursuant to the employee's official duties, *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter of public concern outweighs the employer's interest 'in promoting the efficiency of the public services it performs through its employees,' *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." *Josephson v. Ganzel*, 115 F.4th 771, 783–84 (6th Cir. 2024). The law has been clearly established since at least 2006 that "[s]o long as employees

10

are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419 (citing *Connick, supra*, at 147 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government")).

i. Matter of Public Concern

To determine whether a public employee's speech involves a matter of public concern, for purposes of First Amendment, a court considers the content, form, and context of the statement, as revealed by the whole record. *See Connick*, 461 U.S. at 147-48. While the motive for a public employee's speech is a relevant factor in determining whether speech involves a matter of public concern, the pertinent question is not why employee spoke, but what the employee said; that means court examines the "point" of the speech in question. *See Myers v. City of Centerville, Ohio*, 41 F.4th 746, 760 (6th Cir. 2022) (citations omitted).

Courts "next ask whether that point concerned the public." *Id*. "Broadly stated, speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Id*. (quoting *Connick*, 461 U.S. at 146). "Put differently, speech concerns such matters when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id*. (citing *Lane v. Franks*, 573 U.S. 228, 241 (2014)) (internal quotations omitted).

> For example, we have consistently reiterated that allegations of public corruption are exactly the type of statements that demand strong First Amendment protections. So too are statements exposing governmental inefficiency and misconduct, as well as those addressing failures to follow state law, major state policy decisions, or discrimination of some form. In those easy cases, the public clearly has an interest in hearing the speech.

11

> At the other end of the spectrum is the quintessential employee beef: management has acted incompetently. Hence, speech about internal personnel disputes generally does not involve matters of public concern.

*Myers*, 41 F.4th at 760–61(cleaned up, internal citations and quotations omitted).

"However, even if speech addresses an internal personnel dispute, it may involve a matter of public concern if the dispute arose from actual or potential wrongdoing or any breach of the public trust." *Id.* at 761 (citations and internal quotations omitted). As the Sixth Circuit has explained, "[m]ost internal personnel disputes implicate only the employee's personal interests *qua* employee, while disputes arising from wrongdoing or breaches of trust implicate broader interests in good governance and democratic control." *Id.* (cleaned up, internal citation and quotations omitted); *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004) (noting speech containing information that facilitates "informed decisions about the operation of ... government" involves a matter of public concern); *see also Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997) (noting the relevant distinction is "between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives").

Here, Hamblin's JCAT speech addressed a matter of public concern. First, the "point" of her speech – based mainly on its content – was that the County did not need to spend money reimbursing each of the judicial commissioners for gas mileage each day of the conference because JCAT would cover the costs for them to stay at a hotel. Stated another way, the point of Hamblin's JCAT speech was to expose and/or prevent the unnecessary expenditure (*i.e.*, misuse) of taxpayer money. And it has been clearly established since, at least, 2006 that speech exposing misuse of taxpayer money is a matter of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").

ii.     Pursuant to Hamblin's Job Duties

Public employees' statements made pursuant to their official duties, rather than in their capacities as private citizens, are not protected by the First Amendment. *See Barton v. Neeley*, 114 F.4th 581, 588 (6th Cir. 2024) (citing *Garcetti*, 547 U.S. at 421). "But a public employee's speech that 'simply relates to public employment or concerns information learned in the course of public employment' may be protected." *Id*. at 588–89 (quoting *Lane v. Franks*, 573 U.S. 228, 239 (2014)). "[T]he question of whether a statement was spoken as a public employee or as a private citizen for First Amendment purposes [is] 'a practical one,' requiring a fact-specific inquiry into the 'duties an employee actually is expected to perform.'" *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010) (quoting *Garcetti*, 547 U.S. at 424–25).

In conducting inquiry as to whether public employee's statement was spoken as a public employee or as a private citizen for First Amendment purposes, courts look to the "content and context" of the statement, consulting several non-exhaustive factors, including the speech's impetus; its setting; its audience; and its general subject matter. *See Barton*, 114 F.4th at 589 (citing *Fox*, 605 F.3d at 348 and *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 464 (6th Cir. 2017)). "In sum, 'the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'" *Barton*, 114 F.4th at 589 (quoting *Lane*, 573 U.S. at 240).

Here, the impetus for Hamblin's speech was Coltogirone's email stating the judicial commissioners would be commuting to the conference each day (and be reimbursed for their milage) because, under the County policy, hotel rooms are not provided for events within 50 miles.

13

(*See* Doc. No. 80-4). Hamblin's speech – "JCAT pays for the rooms" – occurred less than 10 minutes later, via email, during the workday. (*Id*.). The audience of Hamblin's speech included Coltogirone, and three other judicial commissioners. (*Id*.). As previously noted, Tennessee law establishes judicial commissioners' official job duties as: issuing search warrants, arrest warrants, mittimus, and injunctions; appointing attorney for indigent criminal defendants; and setting and approving bonds and the release on recognizance of defendants. Tenn. Code Ann. § 40-1-111. And Tennessee law requires judicial commissioners to complete at least ten continuing education hours by attending conferences or courses sponsored or approved by JCAT. *See id*.

Thus, Hamblin's duties as a judicial commissioner included her attending a certain amount of JCAT programming. And Hamblin's speech related to that duty as it was made in the context of her attending a JCAT conference. However, as previously noted, the point of Hamblin's speech was to expose/prevent the unnecessary expenditure of taxpayer money. And the scope of Hamblin's duties as a judicial commissioner did not include managing County expenses or any other involvement in the County's fiscal spending. Accordingly, the Court finds that Hamblin's JCAT speech was not made pursuant to her official duties as a judicial commissioner.

### iii. Balancing Test

Next, the court must balance Hamblin's interests, as a citizen, in commenting upon matters of public concern and Wilson County's interests, as an employer, in promoting the efficiency of the public services it performs through its employees. *See Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012) (citations omitted). In the Sixth Circuit, a court determines the scope of a public employer's interests, on a claim of First Amendment retaliation, by considering whether the employee's speech (1) impairs discipline by superiors or harmony among co-workers, (2) has detrimental impact on close working relationships for which confidence and personal loyalty are

14

necessary, (3) impedes performance of employer's duties or interferes with regular operations of enterprise, or undermines employer's mission; together, these factors center on the employer's effective functioning as a public agency. *See Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 382–83 (6th Cir. 2024) (citation omitted).

Weighing these competing interests, the Court finds that Hamblin's interest in her speech outweighs Wilson County's claimed efficiency interest because no evidence indicates that Hamblin's speech significantly hindered Wilson County's operations. *See Rankin v. McPherson*, 483 U.S. 378, 388–89 (1987) (protecting a public employee's speech made privately with another employee, where there was no evidence that it interfered with the efficient functioning of the office). Accordingly, the Court concludes that Hamblin's JCAT speech was protected speech under the First Amendment.

b.  Adverse Action – Element Two

"For First Amendment retaliation purposes, an adverse action is one that would chill or silence a person of ordinary firmness from future First Amendment activities *Cooperrider v. Woods*, 127 F.4th 1019, 1037 (6th Cir. 2025) (citations and internal quotations omitted). Coltogirone contends that Hamblen lacks evidence of an adverse action because she resigned and because judicial commissioners are appointed by vote of the County Commission. (Doc. No. 85 at 11-15). In her response, Hamblin points to evidence that Coltogirone: (1) removed her from the schedule; (2) notified HR to process her "resignation;" and (3) submersed her judicial commissioner job applications. (*See* Doc. No. 90 at 29-36). Viewing the evidence in the light favorable to Hamblin as the nonmoving party and drawing reasonable inferences in her favor, there is evidence in the record from which a reasonable jury could conclude she suffered an adverse

action. *See Richards v. Perttu*, 96 F.4th 911, 918 (6th Cir. 2024) (Unless the claimed retaliatory action is truly inconsequential, a First Amendment retaliation claim should go to the jury).

      c.  <u>Causal Connection – Element Three</u>

The causal connection element of a First Amendment retaliation claim is satisfied where the adverse employment action occurred within a matter of months, or less, of the protected activity. *See Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (citing *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (concluding that a lapse of three months is sufficient temporal proximity to show causal connection) and *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007) ("[T]he Supreme Court held that a finding of causal connection was not warranted where, among other things, almost two years elapsed between the employee's participation in protected activity and the adverse employment decision.")).

Here, a reasonable jury could find that the chronology of events, as well as the close temporal proximity between Hamblin's protected speech on July 8, 2021, and Coltogirone's removing her from the schedule and notifying HR to process her "resignation" later that same month is sufficient to show a causal connection. *See, e.g.*, *Dye*, 702 F.3d at 306. There is also evidence in the record from which a reasonable jury could find that Coltogirone further retaliated against Hamblin by refusing to consider her for subsequent judicial commissioner positions.

      2.  <u>Prior Restraint</u> (Count VI)

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "A prior restraint is an 'administrative' or 'judicial order' that forbids protected speech in advance." *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) (cleaned up) (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)); *see, e.g.*, *Blick*, 105 F.4th at 878 ("[P]ublic

16

employers adopt employee-targeted 'prior restraints' on speech by prohibiting employees from speaking about certain topics in the future (on the threat of discipline).") (citations omitted).

To determine whether Coltogirone's directive not to speak to anyone about anything related to the judicial commissioners' office prevented Hamblin from speaking as a private citizen on a matter of public concern, the court must look to the content, form, and context of her restrained speech, as revealed by the whole record, and conduct a fact-specific inquiry into the duties she was expected to perform. *See Barton v. Neeley*, 114 F.4th 581, 589 (6th Cir. 2024); *Kirkland v. City of Maryville, Tennessee*, 54 F.4th 901, 908 (6th Cir. 2022) (citing *Connick v. Myers*, 461 U.S. 138, 146–48 (1983)).

Here, Hamblin testified that Coltogirone restrained her from speaking to the D.A. "in reference to charges." (Hamblin Deposition, 117:11-118:3).[5] From this testimony, it appears the restrained speech would have been in the form of a phone call to the District Attorney "in reference to charges." Hamblin was not questioned further about what words she was specifically restrained from stating or what she meant by "charges." As such, the Court finds there is a question of material

---

[5]

> Q.    Okay. Prior to – prior to July 8, 2021, was there anything that you wanted to talk to an elected official about, but you felt like you couldn't?
>
> A.    I several times would have liked to have called the D.A.'s office, but the boss said I couldn't, so I didn't.
>
> Q.    And those several times that you wanted to call the D.A.'s office, why did you want to do that?
>
> A.    In reference to charges.
>
> Q.    Other than the times you wanted to call the D.A.'s office about charges, were they any other instances where you wanted to talk to an elected official about anything?
>
> A.    No, sir.

(Hamblin Deposition, 117:11-118:3).

17

fact for the jury as to what words were specifically restrained. *See Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) ("Whether the speech at issue involves a matter of public concern is a question of law for the court, although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated.") (internal citation omitted) (citing *Waters v. Churchill*, 511 U.S. 661 (1994)).

The Court notes that if Hamblin was restrained from exposing possible government corruption or fraud, as her briefing appears to suggest, that would qualify as restrained speech on a matter of public concern. *See Kirkland*, 54 F.4th at 908 (quintessential examples of "matters of public concern," for purpose of determining whether a public employee's speech is protected under the First Amendment, include allegations of public corruption, mismanagement, or misconduct in government, as well as accusations of unlawful discrimination). And Hamblin's interests, as a citizen, in commenting upon matters of public concern, would win the balancing test because "in cases involving allegations of official misconduct and public corruption, 'the employer's side of the [] scale is entirely empty.'" *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019) (quoting *Lane*, 573 U.S. at 242).

Nevertheless, Coltogirone is entitled to qualified immunity on this claim only if Hamblin's right to be free from "prior restraint" was not clearly established such that "a reasonable official would understand that what [she] is doing violates" the First Amendment. Accordingly, the Court must next determine whether it would be clear to a reasonable official that her conduct was unlawful in the situation that she confronted.

Here, Coltogirone's broad directive was not to talk to elected officials or anyone else about anything in Judicial Commissioner's department, which necessarily includes public corruption. Thus, the speech Coltogirone prevented was of significant interest to the public and the Sixth

Circuit has "consistently protected a public employee's right to discuss issues of public corruption." *Whitney*, 677 F.3d at 298. And the Sixth Circuit has held that case law was clear by 2012 that speech regarding issues of public corruption, workplace discrimination, and misuse of taxpayer money "implicates matters of public concern." *Id*. at 298-99; *see, e.g.*, *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (Speech on a matter of public concern, for purposes of a terminated public employee's free speech claim, includes informing the public that a governmental entity failed to discharge its governmental responsibilities or bringing to light actual or potential wrongdoing or breach of public trust on the part of a governmental entity or any officials therein.). Thus, Hamblin's right to speak on public corruption in the County's government was clearly established by March 19, 2021.

## B. Wilson County

Hamblin claims Wilson County is liable under Section 1983 because Coltogirone was the final policy maker whose policy was the moving force behind the violations of Hamblin's constitutional rights to free speech and procedural due process. Hamblin also brings retaliation claims against Wilson County under Title VII, the THRA, and the PEPFA. For the reasons addressed below, the Court finds that Wilson County has failed to demonstrate the absence of material facts in dispute or that it is entitled to summary judgment as a matter of law.

1. Section 1983 (Counts I, II, III)

To hold Wilson County liable under Section 1983, Hamblin must be able show that (1) agents of Wilson County, while acting under color of state law, (2) violated her constitutional rights, and (3) that a Wilson County policy or a policy of inaction was the moving force behind the violation. *See Memphis, Tennessee Area Local v. City of Memphis*, 361 F.3d 898, 902 (6th Cir.

19

2004). Hamblin claims that Wilson County delegated all authority regarding judicial commissioners to Coltogirone, effectively making her a final decision-maker, and that Coltogirone then used her exclusive authority to restrain speech on matters of public concern, retaliate against Hamblin for her speech, and violate her procedural due process rights. Wilson County challenges Hamblin's ability to satisfy the second and third elements.

### a. Violations of Constitutional Rights

As demonstrated above, Hamblin has shown that she has evidence from which a reasonable jury could conclude that Coltogirone violated her First Amendment rights. *See supra*. [6] Moreover, Wilson County has not put on evidence substantiating its claimed interest against Hamblin's speech. *See Myers v. City of Centerville, Ohio*, 41 F.4th 746, 764 (6th Cir. 2022) (At summary-judgment stage of action asserting a violation of public employee's First Amendment rights, employers must put on evidence substantiating their *Pickering* interests). Accordingly, the Court turns to Hamblin's claim that her procedural due process rights were violated when Defendants terminated her mid-term without statutory ouster proceedings.

"The Fourteenth Amendment requires states to provide 'due process of law' before depriving 'any person of life, liberty, or property.'" *Bambach v. Moegle*, 92 F.4th 615, 624 (6th

---

[6]     Wilson County's arguments to the contrary fail to show otherwise because they are premised on misstatements of either law or fact. It argued Hamblin's JCAT speech was not protected because it related to her work and that her restrained speech was about writing warrants. Its first argument fails to show that it is entitled to summary judgment as a matter of law because "a public employee's speech that 'simply relates to public employment or concerns information learned in the course of public employment' *may be* protected." *Barton v. Neeley*, 114 F.4th 581, 588–89 (6th Cir. 2024) (emphasis added); *Lane v. Franks*, 573 U.S. 228, 249 (2014) ("…speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment."). Its second argument fails because Hamblin did not testify that she was restrained from speaking to the DA about warrants. (*See* Hamblin Deposition, 117:11-118:3). She testified she was restrained from speaking to the DA about charges. (*See id*.). As explained above, viewed in the light most favorable to the nonmoving party, "charges" could mean charges of fiscal mismanagement/corruption.

Cir. 2024) (quoting U.S. Const. amend XIV, § 1). "Procedural due process rights protect individuals from deficient procedures that lead to the deprivation of cognizable liberty interests." *Id*. (citations and internal quotations omitted). To prove a procedural due process claim, a plaintiff must establish that they were deprived of a constitutionally protected interest in life, liberty, or property through state action and the deprivation occurs without adequate process. *See Capen v. Saginaw Cnty., Michigan*, 103 F.4th 457, 462 (6th Cir. 2024). Where public employees are not subject to removal at-will, those "employees have a state-law-created, constitutionally protectable property interest in maintaining their current employment." *Kizer v. Shelby County Gov't*, 649 F.3d 462, 466 (6th Cir. 2011). Stated another way, "[t]he hallmark of property is an individual entitlement grounded in state law, which cannot be removed except for cause." *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 578 (6th Cir. 2021) (citing *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988) and *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)).

Hamblin submits that she had a property interest in her job as a judicial commissioner protected by procedural due process because judicial commissioners are appointed for a set term according to state law by a county commission and cannot be removed from office except by an ouster suit. (*See* Doc. No. 90 at 37-38 (citing Tennessee Attorney General Op. No. 00-126)). Hamblin further submits that, although judicial commissioners are not guaranteed another term, the County Commission is required by state law to hold a public hearing about the judicial commissioner system and are required to consider the views of judges, with whom the work of judicial commissioners is most familiar. Hamblin argues that none of the procedures set out in state law were complied with and that she was entitled to have that process followed.

21

Viewing the facts in the light favorable to Hamblin as the nonmoving party, and drawing reasonable inference in her favor, Wilson County has failed to show that it is entitled to summary judgment as a matter of law on this claim.

b. Wilson County Policy

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Mitchell v. City of Benton Harbor, Michigan*, 137 F.4th 420, 441 (6th Cir. 2025) (citations omitted). "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible." *Id*. (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).

Wilson County asserts that delegating its discretion as to First Amendment issues, discipline, or due process to Coltogirone is insufficient to hold it liable because Coltogirone was not the final policy maker as to those issues. (*See* Doc. No. 82 at 15-19). It submits that Coltogirone was not the final policy maker as to First Amendment or discipline based on Coltogirone's deposition testimony stating that her discretion was guided by the County's Employee Handbook and the Judicial Commission's Policy and Procedure Manual. (*Id*. at 15). It also submits that Coltogirone was not the final policy maker as to the judicial commissioner appointment process because "both the Judicial Committee and County Commission could review and had the 'final' decision as to who was appointed." (*Id*.). Hamblin responds by citing to conflicting evidence regarding Coltogirone's authority and exercise of her discretion. (*See* Wilson County SOF ¶¶ 54, 55, 59, 60, 61, 62, 63, 64, 75, 78, 79, 80).

Viewing the facts in the light most favorable to Hamblin as the nonmoving party and drawing reasonable inferences in her favor, a reasonable jury could conclude that Coltogirone was

22

the final policy maker for all relevant purposes. Accordingly, Wilson County has failed to show that summary judgment is appropriate as a matter of law or fact.

2.  Title VII and THRA[7] (Counts VIII and IX)

Title VII and the THRA prohibit retaliation against an employee for engaging in conduct protected under the statute. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019); Tenn. Code Ann. § 4-21-311.[8] Wilson County moves for summary judgment on Hamblin's Title VII and THRA claims on the basis that she cannot prove its non-retaliatory reasons for not recommending or appointing her as a Judicial Commissioner in the Fall 2021 and February 2022 were pretextual. (*See* Doc. No. 82 at 22 ("Plaintiff fails to carry her burden of persuasion that the proffered reason was pretextual and ultimately fails to carry her burden to show that she was subject to retaliation because of her interview with Fisher or due to her EEOC complaint.")).[9]

---

[7]    "The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims." *Austin v. Alexander*, 439 F. Supp. 3d 1019, 1024 n.2 (M.D. Tenn. 2020) (quoting *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008)). Title VII retaliation claims are decided under the familiar *McDonnell/Douglas* burden shifting framework. *Huang v. Ohio State Univ.*, 116 F.4th 541, 561 (6th Cir. 2024) (citing *Wyatt v. Nissan N. Am., Inc*., 999 F.3d 400, 419 (6th Cir. 2021)).

[8]    To establish a *prima facie* case of Title VII retaliation through indirect evidence, a plaintiff must show that (1) she engaged in protected activity; (2) the employer knew of the protected activity; and (3) the employer took an adverse employment action against her because of her protected activity. *Huang*, 116 F.4th at 561. Wilson County agrees that Hamblin engaged in protected conduct on July 12, 2021, when she was interviewed by Angelita Fisher for an investigation into sexual harassment complaints against Coltogirone, and on September 3, 2021, when she filed a complaint with the EEOC. (*See* Doc. No. 82 at 20). For purposes of summary judgment, Wilson County further agrees that Hamblin was subject to adverse actions when she was not recommended for and was not appointed in September 2021 and February 2022 for Judicial Commissioner. (*Id.*).

[9]    Although Wilson County claims that Hamblin "cannot establish causation," it urges the Court to find no causal connection by taking into account its alleged non-retaliatory reasons for the adverse actions – that Hamblin resigned and was not a good employee – which the Court cannot do when analyzing the *prima facie* case. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) ("Sixth Circuit case law warns against conflating the first (*prima facie* case) and second (articulation of a legitimate non-discriminatory reason) steps in the *McDonnell–Douglas* analysis."); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002) ("...the legitimate non-discriminatory reason offered by the employer at the second stage of the *McDonnell Douglas* inquiry may not be considered in determining whether the employee has produced sufficient evidence to establish a *prima facie* case.").

Wilson County's argument brings the Court to the second step of the tripartite *McDonnell/Douglas* burden-shifting framework, where it has the burden to "clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse action]." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "An articulation not admitted into evidence will not suffice." *Id*. at n.9. If the defendant meets its burden of production, the plaintiff must demonstrate that the proffered reason was not the true reason for the adverse action. *See id*. at 256 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973)).

Here, Wilson County submits that its non-retaliatory reasons for not recommending and not selecting Hamblin for an appointment as a Judicial Commissioner in the Fall 2021 and February 2022 are that "she was not a good employee" and "she resigned." (*See* Doc. No. 82 at 22 (citing page 80 of Coltogirone's deposition testimony)). However, Wilson County fails to produce page 80 of Coltogirone's deposition, where it contends she clearly sets forth these claimed reasons for the adverse actions it took against Hamblin. (*See generally* Coltogirone Deposition Excerpts, Doc. No. 80-1). As "[a]n articulation not admitted into evidence will not suffice," *see supra*, Wilson County fails to meet its burden of production. Because Wilson County has failed to meet its burden at step two of the *McDonnell Douglas* framework, the Court does not reach pretext.

### 3. Tennessee Public Employee Political Freedom Act (Count IV)

PEPFA makes it "unlawful for any public employer to discipline, threaten to discipline or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official." Tenn. Code Ann. § 8-50-603(a). Hamblin submits that the timeline from her JCAT speech, the insistence by Coltogirone that her "I quit" email constituted a resignation, Coltogirone removing her from the work schedule, and then Coltogirone's sharing of the "I quit" email with Human Resources to effectuate the cessation of

24

Hamblin's pay all create a material dispute of fact as to whether Hamblin's speech was a substantial or motivating factor in Coltogirone's actions. (*See* Doc. No. 90 at 39). In its reply, Wilson County appears to argue that Hamblin's response fails to show a genuine issue of material fact because she had already resigned at the time of her speech with the mayor and judicial committee members. (Doc. No. 99 at 11-12). The Court has already determined there is a genuine issue of material fact as to whether Hamblin resigned. Accordingly, summary judgment is inappropriate on this claim.

## IV.  CONCLUSION

For the foregoing reasons, Wilson County's motion for summary judgment (Doc. No. 80) will be **DENIED** and Coltogirone's motion for summary judgment (Doc. No. 83) will be **GRANTED** as to Count VII and will be **DENIED** as to the remaining claims.

An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE